IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALAN E. COOPER, M.D.,<br>for himself and on behalf of the<br>United States of America<br><br>Relator,<br><br>v.<br><br>POTTSTOWN HOSPITAL CO., LLC<br>d/b/a POTTSTOWN MEMORIAL<br>MEDICAL CENTER<br>and<br>COMMUNITY HEALTH SYSTEMS, INC.:<br><br>Defendants | CIVIL ACTION NO.<br><br>JURY TRIAL DEMANDED<br><br>FILED UNDER SEAL |

## *QUI TAM* COMPLAINT

### I.   PRELIMINARY STATEMENT

This *qui tam* action is brought by Relator, Alan E. Cooper, M.D. ("Dr. Cooper"),

for himself and on behalf of the United States, against Pottstown Hospital Co., LLC

d/b/a Pottstown Memorial Medical Center ("PMMC"), and its owner, Community Health

Systems, Inc. ("CHS"), to recover damages, fines, and other relief arising from

violations of the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* ("FCA"). In

2012, Dr. Cooper, an orthopedic surgeon who works at PMMC as an independent

contractor, discovered that written contracts Defendants had entered into with Dr.

Cooper and other physicians affiliated with PMMC, under which the physicians were to

provide on-call services on a rotational basis in exchange for remuneration, were in

violation of the Medicare and Medicaid Patient Protection Act of 1987, as amended, 42

U.S.C. § 1320a-7b ("Anti-Kickback Statute"). Specifically, those contracts and the payments that were made to the doctors pursuant to the contracts were an inducement for the doctors to refer patients, and particularly Medicare patients, to PMMC. Dr. Cooper was able to discover Defendants' violations of the Anti-Kickback Statute when his and two of the other doctors' contracts were terminated because they would not agree to refer patients exclusively to PMMC. Defendants did *not* terminate the contracts of the other PMMC physicians because Defendants believed and expected that they would continue to refer patients, including Medicare patients within PMMC's surrounding catchment area, exclusively to PMMC. Prior to 2012, Dr. Cooper was misled by false representations Defendants made in his contract to believe that all of the contracts were in compliance with the Anti-Kickback Statute.  Because Defendants expressly and impliedly certified to the United States Government and/or Medicare that they were in compliance with AKS and that such compliance was a condition to receiving payments and reimbursements from Medicare, Defendants' violations of the Anti-Kickback Statute also constituted violations of FCA and resulted in Defendants receiving huge financial reimbursements from Medicare to which they were not entitled. Furthermore, Dr. Cooper avers, on information and belief, that as a matter of corporate policy, CHS violated the Anti-Kickback Statute by entering into the same or similar contracts with physicians affiliated with other hospitals owned by CHS, as an inducement for those physicians to refer Medicare patients exclusively to the CHS-owned hospitals.

## II.    PARTIES

1.    Relator, Dr. Cooper, is a citizen of the Commonwealth of Pennsylvania

who at all relevant times has resided at 1004 Mulberry Street, Chester Springs, PA 19425.

2.     Defendant, Pottstown Hospital Co., LLC d/b/a Pottstown Memorial Medical Center ("PMMC"), is a not-for-profit limited liability company or other legal entity that operates a health care facility at 1600 East High Street, Pottstown, PA 19464.

3.     PMMC is and at all relevant times has been a 200 plus bed hospital accredited by the Joint Commission, with a medical staff consisting of more than 200 physicians representing more than 30 medical specialties.

4.     Defendant, Community Health Systems, Inc. ("CHS"), is a for-profit corporation or other legal entity with a main office and corporate headquarters located at 4000 Meridian Boulevard, Franklin, TN 37067.

5.     At all relevant times, CHS has been one of the nation's leading operators of general and acute care hospitals; and at present, CHS owns or operates more than 125 hospitals throughout the country.

6.     In or around 2005, CHS purchased, acquired and became the owner of PMMC; and CHS has owned PMMC from approximately 2005 to the present.

7.     At all relevant times, PMMC and CHS acted by and through their authorized agents, servants and employees, acting within the course and scope of their agency and employment, and in furtherance of the Defendants' mission, business, affairs and corporate policies.

8.     At all relevant times, CHS, as the owner of PMMC, exercised sufficient control, authority and dominance over PMMC to impose liability on CHS for the acts and conduct of PMMC alleged herein.

III.    **JURISDICTION AND VENUE**

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1345, 31 U.S.C. § 3729, 31 U.S.C. § 3730(b) and 31 U.S.C. § 3732(a).

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. 3732(a), in that the Defendants are found and reside in this district; Defendants transact business in this district; and Defendants' violations of the False Claims Act and the Anti-Kickback Statute occurred in this district.

11.     Prior to filing this Complaint, Dr. Cooper served a copy of the Complaint, together with a written disclosure statement required by 31 U.S.C. § 3730(b)(2), upon the United States.

IV.    **FACTS**

A.    **Dr. Cooper's Background, Training and Qualifications**

12.     In 1989, Dr. Cooper graduated from Hahnemann University School of Medicine in Philadelphia and received his M.D. degree.

13.     From 1989 to 1990, Dr. Cooper was a surgical intern at Albert Einstein Medical Center in Philadelphia.

14.     From 1990 to 1992, Dr. Cooper was a resident in Orthopedic Surgery at Kingsbrook Jewish Medical Center in Brooklyn, New York.

15.     From 1992 to 1995, Dr. Cooper was a resident in Orthopedic Surgery at Allegheny General Hospital in Pittsburgh, Pennsylvania; and from 1994 to 1995, he served as Chief Administrative Resident at Allegheny General Hospital.

16.     From 1995 to 1996, Dr. Cooper did a fellowship in Sports Medicine at the Cleveland Clinic Foundation in Cleveland, Ohio, under the supervision of John A.

Bergfeld, M.D.

17.     From 1994 to the present, Dr. Cooper has been licensed to practice medicine in the Commonwealth of Pennsylvania.

18.     In 1998, Dr. Cooper was board-certified by the American Board of Orthopedic Surgery; he was recertified by that Board in 2008; and he has maintained his board certification status at all times from 1998 to the present.

19.     At all relevant times, Dr. Cooper has been a member of various medical societies, including the Pennsylvania Medical Society, the Pennsylvania Orthopedic Society, the American Medical Association, and the American College of Surgeons.

20.     From 1998 to the present, Dr. Cooper has been Fellow of the American Academy of Orthopedic Surgeons.

21.     Throughout the course of his distinguished professional career, Dr. Cooper has given many lectures and presentations on topics related to his specialty of orthopedic surgery.

22.     Throughout the course of his professional career, Dr. Cooper has served as a Team Physician, Assistant Team Physician, Orthopedic Consultant or Physician in Attendance for various high schools, prep schools, colleges, sports clubs, and professional sports teams.

**B.      Dr. Cooper's Relevant Employment
         and Work History at PMMC and PMSI**

23.     In 1999, Dr. Cooper joined Pottstown Medical Specialists, Inc. ("PMSI"), a physician-owned, multi-specialty group medical practice with offices located in Montgomery County, Berks County, and Chester County in Southeastern Pennsylvania.

24.     Dr. Cooper was employed by PMSI, as an orthopedic surgeon, from 1999

until July of 2011.

25.     In or around 2005, when CHS acquired PMMC, CHS purchased and acquired a minority ownership interest in PMSI; and from 2005 to the present, CHS has been a part owner of PMSI.

26.     In or around 1999, Dr. Cooper was appointed to the active medical staff of PMMC, in the Department of Surgery.

27.     Dr. Cooper has been a member of the active medical staff of PMMC from approximately 1999 to the present.

28.     Dr. Cooper's affiliation with PMMC is, and always has been, as an independent contractor.

29.     Throughout the course of his professional affiliation with PMMC, Dr. Cooper has referred many patients to PMMC for orthopedic surgery and orthopedic-related care.

30.     Due to the nature of his practice, a large percentage of the patients Dr. Cooper has referred to PMMC have been Medicare-eligible; and PMMC has probably received, in the aggregate, millions of dollars in reimbursements from Medicare for care, treatment and services provided to those patients at PMMC.

31.     At all relevant times, Dr. Cooper has been one of approximately eight orthopedic surgeons on the active medical staff of PMMC who are on rotation in the emergency department ("ER") of PMMC; and on information and belief, the other orthopedic surgeons who maintain that status (collectively, "other PMMC Orthopedists") are also independent contractors.

32.     At all relevant times, the other PMMC Orthopedists have each referred

many patients to PMMC for orthopedic care, treatment and surgery.

33.     The other PMMC Orthopedists are, or include, Dr. Guille, Dr. Whittaker, Dr. Lipton, Dr. Mashru, Dr. D'Andrea, Dr. Pavlides, and Dr. Schwartz.

34.     Due to the nature of their practices, many of the patients who the other PMMC Orthopedists have referred to PMMC over the years have been Medicare-eligible; and PMMC has probably received many millions of dollars in reimbursements from Medicare for care, treatment and services provided to those patients at PMMC.

**C.     On-Call Coverage Agreements Between PMMC, Dr. Cooper and the Other PMMC Orthopedists**

35.     In February 2010, PMMC offered Dr. Cooper a written contract entitled "On-Call Coverage Agreement" for the year 2010; and Dr. Cooper and PMMC entered into and executed the contract in February 2010 ("Dr. Cooper's On-Call Agreement").

36.     On information and belief, at or around the time that PMMC and Dr. Cooper entered into Dr. Cooper's On-Call Agreement, PMMC offered the other PMMC Orthopedists written contracts that included terms that were the same as, or similar to, those in Dr. Cooper's On-Call Agreement (collectively, "On-Call Agreements"); and each of the other PMMC Orthopedists also entered into an On-Call Agreement with PMMC.

37.     On information and belief, the On-Call Agreements were offered to Dr. Cooper and the other PMMC Orthopedists at or with the urging, insistence, encouragement, approval and/or authority of CHS, which owned PMMC.

38.     The On-Call Agreements were structured so that in each week of the year, Dr. Cooper or one of the other PMMC Orthopedists would be on call (on a rotational basis) for consultation and treatment of orthopedic patients in the ER of PMMC.

39.     Defendants formulated, drafted and determined the language and contents of the On-Call Agreements.

40.     Dr. Cooper's On-Call Agreement, as drafted by Defendants, provided, *inter alia,* that any notice that was required or desired to be given under the agreement was to be delivered to PMMC as well as to CHS's legal department; and on information and belief, the On-Call Agreements that the other PMMC Orthopedists entered into with PMMC included the same or a similar provision.

41.     Dr. Cooper's On-Call Agreement included the following additional provisions:

(a)     That the agreement would be in effect during the year 2010;

(b)     That Dr. Cooper was to be "on call in accordance with the relevant call coverage schedule to provide emergency consultation and, where appropriate, assume responsibility for care of patients who present to the emergency department of [PMMC]", with each coverage day consisting of 24 hours;

(c)     That PMMC would pay Dr. Cooper a fee of $650 for each day of each week that he provided rotational coverage as the doctor on call, for a total weekly payment of $4,450, with the payments to be made to Dr. Cooper regardless of whether he was called into the ER or the number or hours he actually worked; and

(d)     That Dr. Cooper and PMMC each had the right to terminate the agreement, for any reason, by providing 60 days written notice to the other party.

42.     Dr. Cooper's On-Call Agreement did not include a non-compete or restrictive covenant; and because it related solely to Dr. Cooper's rotational responsibilities at PMMC during a relatively small portion of his professional time, it

would have been unreasonable for him to think that Defendants did not expect him to have other professional responsibilities outside of PMMC.

43.     Dr. Cooper's On-Call Agreement, as drafted by Defendants with no input from Dr. Cooper, included the following additional provisions: (a) that Dr. Cooper was representing and warranting that "no part of the compensation [that was to be] paid" to him under the agreement was "in exchange for the referral or arrangement for referral of any patient to [PMMC]"; and (b) that Dr. Cooper was further representing and warranting that in connection with the services he would be performing under his agreement, he would be compensated in a manner that complied with various federal and state laws, including the Anti-Kickback Statute or "AKS" (known herein as "AKS Compliance Provisions").

44.     On information and belief, the On-Call Agreements that PMMC entered into with the other PMMC Orthopedists included the same or similar AKS Compliance Provisions.

45.     The AKS Compliance Provisions which Defendants included in the On-Call Agreements were false and misleading in that they caused Dr. Cooper to believe that his financial arrangement with PMMC, as reflected in his agreement, was legal and in compliance with the AKS. As Dr. Cooper later discovered, his and the other On-Call Agreements, and the payments that were made to the doctors pursuant to the agreements, were offered and provided by Defendants as an inducement for the doctors to refer Medicare patients to PMMC, in violation of the AKS.

46.     On information and belief, as a matter of corporate policy and practice, CHS caused, induced and/or encouraged other hospitals and health care facilities that it

owns or operates to enter into the same or similar On-Call Agreements with physicians working at CHS-owned hospitals.

**D.    Circumstances Surrounding Termination of Dr. Cooper's On-Call Agreement and Execution of Second On-Call Agreement**

47.    In or around October 2010, an entity known as Physicians Care Surgical Hospital ("PCSH"), a physician-owned multi-specialty surgical facility, opened its facility approximately 6.3 miles from PMMC.

48.    At all relevant times, Dr. Cooper was an investor in and minority owner of PCSH, and there was no legal or contractual prohibition or impediment to Dr. Cooper being affiliated professionally with PMMC, PMSI and PCSH at the same time.

49.    In or around September 2010, Defendants discovered that Dr. Cooper had a financial investment or ownership interest in PCSH.

50.    In or around September 2010 and October 2010, Dr. Cooper was called to several meetings with John Kirby, the Chief Executive Officer of PMMC, to discuss Dr. Cooper's affiliation with PCSH (collectively, "2010 Meetings"). Some of the 2010 Meetings were also attended by the Chief Financial Officer of PMMC, Michael Zwetschkenbaum.

51.    The following statements and threats were made to Dr. Cooper at the 2010 Meetings:

(a)    Mr. Kirby said that he was "drawing a line in the sand", and that Dr. Cooper was either on CHS's side or on "the other side" (referring to PCSH);

(b)    Dr. Cooper was urged and pressured to relinquish his financial interest in PCSH in order to continue to get paid for taking ER call like the other PMMC Orthopedists, and he was enticed with an offer of a salaried directorship position at

PMMC only if he agreed to relinquish his financial interest in PCSH;

> (c)    Dr. Cooper was given one week to decide whether to voluntarily give up his ownership interest in PCSH;

> (d)    When Dr. Cooper stated that he would refer some of his patients to PCSH but would continue to refer his larger cases to PMMC, Mr. Kirby responded that if Dr. Cooper did "one carpal tunnel case" at PCSH "we lose money", and that "we need everything here" (referring to PMMC);

> (e)    The CFO of PMMC, Mr. Zwetschkenbaum, told Dr. Cooper that his financial investment in PCSH was a "bad idea", and that PMMC would "crush" PCSH; and

> (f)    Mr. Zwetschkenbaum threatened to terminate Cooper's On-Call Agreement if he brought any cases to PCSH and did not refer patients exclusively to PMMC.

52.    In another meeting that Dr. Cooper attended, Jeff Smith, the CEO of PMSI, asked Dr. Cooper why he had performed a total knee replacement at PCSH rather than at PMMC; and Mr. Smith informed Dr. Cooper that he had been asked by CHS to keep a record of Dr. Cooper's case volume and types of surgeries performed at PCSH.

53.    On information and belief, the statements, threats, inquiries and ultimatums that were given and made to Dr. Cooper at the 2010 Meetings and at the meeting with Mr. Smith were approved, adopted, provoked, encouraged and/or authorized by CHS.

54.    Notwithstanding what occurred at the 2010 Meetings and at the meeting

with Mr. Smith, Dr. Cooper refused to voluntarily relinquish his financial interest in POSH, which was viewed by Defendants as their competitor.

56.     As a result of Dr. Cooper's refusal to yield to Defendants' threats and pressure, and his decision to continue his affiliation with PCSH, Mr. Kirby sent Dr. Cooper a certified letter (with a copy to Mr. Smith) on October 8, 2010, informing him that PMMC was terminating his On-Call Agreement.

56.     Consistent with Mr. Kirby's letter of October 8, 2010, Dr. Cooper's On-Call Agreement was terminated by PMMC, over Dr. Cooper's objection, on or about December 13, 2010.

57.     To the best of his knowledge and information, Dr. Cooper was the only PMMC Orthopedist actively taking ER call at PMMC whose On-Call Agreement was terminated; and after Dr. Cooper's On-Call Agreement was terminated, the other PMMC Orthopedists continued receiving payments from PMMC under their On-Call Agreements. Furthermore, on information and belief, the other PMMC Orthopedists' On-Call Agreements were renewed by Defendants after 2010.

58.     One of the PMMC Orthopedists whose On-Call Agreement was *not* terminated by Defendants, Dr. Schwartz, is and at all relevant times was an employee of PMSI like Dr. Cooper. However, Dr. Schwartz, unlike Dr. Cooper, has no financial interest in PCSH.

59.     The differential treatment received by Dr. Cooper resulted from the fact that at all relevant times, he was the only PMMC Orthopedist actively taking ER call who was an investor in or an owner of PCHS; and to the best of his knowledge, he was the only PMMC Orthopedist who was regarded by Defendants as a competitor or financial

threat to Defendants.

60.     Defendants singled out Dr. Cooper for the adverse treatment because they believed and expected that he would refer some patients to PCSH, and would not refer them exclusively to PMMC.

61.     Defendants did *not* terminate the On-Call Agreements of the other PMMC Orthopedists, including Dr. Schwartz, because Defendants believed and expected that they would continue to refer patients exclusively to PMMC while working within the catchment area of PMMC.

62.     In objecting to the termination of his On-Call Agreement, Dr. Cooper pointed out to PMMC that the volume of his practice at PCSH was low in comparison to that at PMMC, and that he continued to generate large revenues for PMMC as one of the most productive orthopedic surgeons there.

63.     However, as long as Mr. Kirby was the CEO, PMMC refused to revoke or rescind Defendants' decision to terminate Dr. Cooper's On-Call Agreement unless he gave up, sold or relinquished his financial interest in PCSH.

64.     In or around March of 2011, Dr. Cooper spoke to Charles Gorey, D.O., a primary care physician affiliated with PMMC.  At that time, Dr. Gorey informed Dr. Cooper that he had attended a meeting with other CHS-owned primary care physicians at which the CEO of PMMC had instructed the doctors who were present at the meeting not to refer or medically clear any pre-op patient to any physician who had a financial or ownership interest in PCSH.

65.     As of March 2011, Mr. Kirby had left the employment of PMMC and had been replaced as CEO by Sharif Omar.

66.     Dr. Cooper asked Mr. Omar to renew or reinstate his On-Call Agreement which had been terminated in 2010; and on or about April 1, 2011, PMMC and Dr. Cooper agreed and entered into a new, one-year On-Call Agreement ("Second On-Call Agreement").

67.     Dr. Cooper's Second On-Call Agreement was drafted by Defendants; and it included the same provisions as the first On-Call Agreement with one notable exception:  Defendants insisted on the inclusion of a non-compete or restrictive covenant in the Second On-Call Agreement which allowed Dr. Cooper to continue his affiliation with PCSH, but required him "not [to] enter into any agreement or arrangement with any other facility within thirty (30) miles of [PMMC]...to provide professional services without the prior written consent of [PMMC]" ("restrictive covenant").

68.     Dr. Cooper agreed to the restrictive covenant because Defendants would not agree to the Second On-Call Agreement unless it included such a provision.

69.     Dr. Cooper's Second On-Call Agreement, as drafted by Defendants, included the same AKS Compliance Provisions that Defendants had included in the first On-Call Agreement, as a result of which Dr. Cooper continued to be misled by Defendants to believe that they were complying with the AKS.

70.     As it will be discussed, Dr. Cooper later discovered that his and his colleagues' On-Call Agreements were in violation of the AKS notwithstanding the AKS Compliance Provisions because the said agreements and the payments that were made by Defendants pursuant thereto were an inducement for the referrals of Medicare patients to PMMC.

**E.    Termination Of Dr. Cooper's Affiliation With PMSI
       And Termination of Second On-Call Agreement**

71.    In April 2011, Dr. Cooper was informed at a meeting he had with Mr. Smith and Kennedy Sbat, D.O. (Director of ICU at PMMC) that after 12 years, PMSI was not renewing his employment contract with PMSI, primarily because of his ownership interest in PCSH. As alleged above, PMSI is partly owned by CHS and is thus an integral component of PMMC, which competes with PCSH.

72.    On or about April 19, 2011, after his meeting with Mr. Smith and Dr. Sbat, Dr. Cooper received a letter from PMSI giving him 90 days notice of termination from PMSI, with the termination to become effective on July 23, 2011.

73.    Dr. Cooper's Second On-Call Agreement with PMMC remained in effect after April 19, 2011.

74.    In October 2011, Dr. Cooper, needing new employment to replace PMSI from which he had been terminated, accepted a position with St. Joseph's Medical Center in Reading, PA ("St. Joseph's"), which is not affiliated with CHS.

75.    On or about October 31, 2011, after discovering that Dr. Cooper had been working at St. Joseph's, Mr. Omar, the CEO of PMMC, sent Dr. Cooper a letter informing him that his Second On-Call Agreement would be terminated within 30 days due to his violation of the restrictive covenant.

76.    Dr. Cooper's Second On-Call Agreement was thus terminated by Defendants on November 30, 2011, and was not renewed at any time thereafter.

77.    Defendants caused Dr. Cooper's Second On-Call Agreement to be terminated as a punitive and anti-competitive measure because Defendants believed and expected that Dr. Cooper would refer patients (including Medicare patients) to St.

Joseph's rather than to PMMC.

78.     On information and belief, Defendants did *not* terminate the On-Call Agreements of the other PMMC Orthopedists (including Dr. Schwartz) because Defendants believed and expected that those doctors would continue to refer patients, including Medicare patients, to PMMC and not to any competing entity or group.

### F.     Discovery by Dr. Cooper of Defendants' Violations of the Anti-Kickback Statute

79.     After Dr. Cooper's Second On-Call Agreement was terminated by Defendants, he consulted with counsel.

80.     In 2012, Dr. Cooper was able to determine that the acts and conduct of Defendants alleged *supra,* including the payments that were made to him and the other PMMC Orthopedists under the On-Call Agreements, were in violation of the AKS, and therefore, that the AKS Compliance Provisions that Defendants had put in his On-Call Agreements were false and misleading.

81.     Dr. Cooper further discovered in 2012 that the said acts and conduct of Defendants, including making payments to the doctors under the On-Call Agreements; terminating his On-Call Agreements because of his competing medical practices; and *not* terminating the On-Call Agreements of the other PMMC Orthopedists who were not regarded as competitors, proved that all of the payments made by Defendants pursuant to all of the On-Call Agreements were, and were intended to be, an inducement for the doctors to refer patients (and in particular, Medicare patients) to PMMC, in violation of the AKS.

82.     Dr. Cooper further discovered in 2012 that Defendants had singled him out as the only PMMC Orthopedist who had his On-Call Agreement terminated because

16

of Defendants' belief and expectation that he would refer patients to entities that
competed locally with PMMC.

83.      In October 2012, Dr. Cooper obtained further proof of Defendants'
violations of the AKS when he spoke to Dr. Paris, a general surgeon who along with Dr.
Behr, were at all relevant times was affiliated with PMMC as independent contractors.

84.      At all relevant times, Dr. Paris and Dr. Behr were on active ER rotation at
PMMC.

85.      In addition, at all relevant times, Dr. Paris and Dr. Behr were minority
owners of and investors in PCSH; and they were the only general surgeons on active
ER rotation at PMMC who had an affiliation with PCSH.

86.      In October 2012, Dr. Paris told Dr. Cooper that in or around 2010, PMMC
had offered and entered into agreements with Dr. Paris, Dr. Behr and other general
surgeons on active ER rotation at PMMC; and that those agreements included terms
and provisions that were similar to those in Dr. Cooper's On-Call Agreements.

87.      Dr. Paris further informed Dr. Cooper in October 2012 that in or around
January 2011, Dr. Paris and Dr. Behr had received correspondence from PMMC
informing them that their agreements were being terminated without cause; and that the
asserted reason was that they had an ownership interest in PCSH.

88.      Dr. Paris further informed Dr. Cooper in October 2012 that the other
general surgeons on active ER rotation at PMMC, none of whom were affiliated with
PCSH, were subsidized by Defendants, and did not have their agreements terminated
by Defendants.

89.      The information that Dr. Cooper received from Dr. Paris further revealed

that Defendants had engaged in or followed a policy and/or practice of violating the AKS by entering into agreements with physicians at PMMC for the provision of on-call or rotational services; providing remuneration to the physicians under the agreements as an inducement for the referral of Medicare patients to PMMC; and punishing those physicians who were discovered to have referred Medicare patients to a competing surgical facility (PCSH) by causing their agreements to be terminated.

## V.     FIRST CAUSE OF ACTION: RELATOR v. PMMC

90.     Dr. Cooper incorporates by reference all of the averments of ¶¶ 1 through 89, above, as if set forth fully and at length herein.

91.     The said acts and conduct of PMMC were in violation of the Medicare and Medicaid Patient Protection Act of 1987, as amended, 42 U.S.C. § 1320a-7b ("AKS").

92.     PMMC violated the AKS by knowingly and willfully offering to pay, paying and providing remuneration to the physicians pursuant the said agreements as an inducement for the physicians to refer patients to PMMC for the furnishing of care, treatment and services for which payments and reimbursements were and would be made by Medicare.

93.     In addition, PMMC's violations of the AKS that resulted in the said reimbursements by Medicare constituted false and/or fraudulent claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *set seq.*

94.     On information and belief, PMMC at all relevant times represented, warranted and certified to the United States Government and/or Medicare, expressly and impliedly, that it had complied and/or would comply with the relevant laws, statutes and regulations pertaining to Medicare reimbursements, including the AKS.

95.    On information and belief, PMMC at all relevant times further represented, warranted and certified to the United States Government and/or Medicare, expressly and impliedly, that compliance with the said laws, statutes and regulations, including the AKS, was and/or would be a condition or prerequisite to payment or reimbursement by Medicare for care, treatment and services furnished to patients treated at PMMC, including those referred to PMMC by the physicians who received remuneration from PMMC pursuant to the said agreements.

96.    PMMC's said representations and certifications were false and/or fraudulent because PMMC violated the AKS by engaging in the acts and conduct alleged herein.

97.    By engaging in the said acts and conduct, including offering, paying and providing remuneration to physicians as an inducement for referrals of Medicare patients to PMMC notwithstanding its representations and certifications, PMMC knowingly submitted and/or caused to be submitted for payment or reimbursement by the United States Government, claims that were false and/or fraudulent, resulting in Medicare reimbursements to which PMMC was not entitled.

98.    By engaging in the said acts and conduct notwithstanding its representations and certifications, PMMC knowingly made, used and/or caused to be made or used, false records and/or statements that were material to false and/or fraudulent claims for payment or reimbursement that were submitted to the United States Government, resulting in Medicare reimbursements to which PMMC was not entitled.

99.    At all relevant times, PMMC violated the FCA with actual knowledge of

the false and/or fraudulent claims it made and submitted to obtain the said payments and reimbursements.

100.    In addition, or in the alternative, PMMC acted with deliberate ignorance of the truth or falsity of the false and/or fraudulent claims it made and submitted to obtain the said payments and reimbursements.

101.    In addition, or alternatively, PMMC acted in reckless disregard of the truth or falsity of the false and/or fraudulent claims it made and submitted to obtain the said payments and reimbursements.

102.    On information and belief, PMMC has failed to report or return the improper payments and reimbursements it has received from Medicare in violation of the AKS and the FCA.

103.    PMMC approved, authorized and/or ratified the violations of the AKS and the FCA committed by PMMC's agents, officers and employees.

104.    The United States Government and the public fisc have been harmed as a result of PMMC's said violations of the AKS and the FCA.

WHEREFORE, Relator, Alan E. Cooper, M.D., prays that this Honorable Court grant the following relief:

(a)    Declaring the acts and practices of PMMC complained of herein to be in violation of the FCA and the AKS;

(b)    Entering a judgment against PMMC in an amount equal to three times the amount of damages which the United States Government has sustained as a result of PMMC's violations of the FCA and the AKS;

(c)    Entering a judgment against PMMC for a civil fine in the amount of

at least $10,000 for each of PMMC's violations of the FCA and the AKS;

(d)     In the event the United States Government elects to intervene in this *qui tam* action, awarding Relator an amount equal to not less than 15% and not more than 25% of the proceeds recovered from PMMC in the action;

(e)     In the event the United States Government elects not to intervene in this *qui tam* action, awarding Relator an amount equal to not less than 25% and not more than 30% of the proceeds recovered from PMMC in the action;

(f)     Awarding Relator the reasonable expenses incurred in connection with the prosecution of the action;

(g)     Awarding Relator reasonable attorney's fees and costs incurred in connection with the prosecution of the action;

(h)     Awarding Relator prejudgment interest; and

(i)     Granting any and all additional relief that is just and appropriate.

## VI.     SECOND CAUSE OF ACTION: RELATOR v. CHS

105.     Dr. Cooper incorporates by reference all of the averments of ¶¶ 1 through 104, above, as if set forth fully and at length herein.

106.     The said acts and conduct of CHS were in violation of the AKS.

107.     CHS violated the AKS by knowingly and willfully offering to pay, paying, providing and/or causing hospitals it owned and operated to pay and provide to physicians who were affiliated with the CHS-owned hospitals, including PMMC, remuneration pursuant to agreements which CHS created, approved, adopted, authorized and/or implemented, as an inducement for the physicians to refer patients to the CHS-owned hospitals for the furnishing of care, treatment and services for which

payments and reimbursements were and would be made by Medicare.

108.    In addition, CHS's violations of the AKS that resulted in the said

reimbursements by Medicare constituted false and/or fraudulent claims under the FCA.

109.    On information and belief, CHS at all relevant times represented,

warranted, certified and/or caused hospitals it owned, including PMMC, to represent,

warrant and certify to the United States Government and/or Medicare, expressly and

impliedly, that CHS and/or hospitals it owned had complied and/or would comply with

the relevant laws, statutes and regulations pertaining to Medicare reimbursements,

including the AKS.

110.    On information and belief, at all relevant times, CHS at all relevant times

further represented, warranted, certified and/or caused hospitals it owned and operated,

including PMMC, to represent, warrant and certify to the United States Government

and/or Medicare, expressly and impliedly, that compliance with the said laws, statutes

and regulations, including the AKS, was and/or would be a condition or prerequisite to

payment or reimbursement by Medicare for care, treatment and services furnished to

patients who were referred to CHS-owned hospitals, including PMMC, by the physicians

who received remuneration pursuant to the said agreements.

111.    The said representations and certifications were false and/or fraudulent

because CHS violated the AKS by engaging in the acts and conduct alleged herein.

112.    By engaging in the said acts and conduct, including offering, paying,

providing and/or causing the said physicians to be offered, paid or provided

remuneration as an inducement for the referrals of Medicare patients to CHS-owned

hospitals notwithstanding the said representations and certifications, CHS knowingly

submitted and/or caused to be submitted for payment or reimbursement by the United States Government, claims that were false and/or fraudulent, resulting in Medicare reimbursements to which CHS and the hospitals it owns were not entitled.

113.     By engaging in the said acts and conduct notwithstanding the said representations and certifications, CHS knowingly made, used and/or caused to be made or used, false records and/or statements that were material to false and/or fraudulent claims for payment or reimbursement that were submitted to the United States Government, resulting in Medicare reimbursements to which CHS and the hospitals it owns were not entitled.

114.     At all relevant times, CHS violated the FCA and/or caused the FCA to be violated with actual knowledge of the false and/or fraudulent claims that were made and submitted to obtain the said payments and reimbursements.

115.     In addition, or in the alternative, CHS acted with deliberate ignorance of the truth or falsity of the false and/or fraudulent claims that were made and submitted to obtain the said payments and reimbursements.

116.     In addition, or alternatively, CHS acted in reckless disregard of the truth or falsity of the false and/or fraudulent claims that were made and submitted to obtain the said payments and reimbursements.

117.     On information and belief, CHS has failed to report or return the improper payments and reimbursements it and hospitals it owns have received from Medicare in violation of the AKS and the FCA.

118.     CHS approved, authorized and/or ratified the violations of the AKS and the FCA committed by CHS's agents, officers and employees.

119.    The United States Government and the public fisc have been harmed as a result of CHS's said violations of the AKS and the FCA.

WHEREFORE, Relator, Alan E. Cooper, M.D., prays that this Honorable Court grant the following relief:

(a)    Declaring the act and practices of CHS complained of herein to be in violation of the FCA and the AKS;

(b)    Entering a judgment against CHS in an amount equal to three times the amount of damages which the United States Government has sustained as a result of CHS's violations of the FCA and the AKS;

(c)    Entering a judgment against CHS for a civil fine in the amount of at least $10,000 for each of CHS's violations of the FCA and the AKS;

(d)    In the event the United States Government elects to intervene in this *qui tam* action, awarding Relator an amount equal to not less than 15% and not more than 25% of the proceeds recovered in the action from CHS;

(e)    In the event the United States Government elects not to intervene in this *qui tam* action, awarding Relator an amount equal to not less than 25% and not more than 30% of the proceeds recovered in the action from CHS;

(f)    Awarding Relator the reasonable expenses incurred in connection with the prosecution of the action;

(g)    Awarding Relator the reasonable attorneys' fees and cost incurred in connection with the prosecution of the action;

(h)    Awarding Relator prejudgment interest; and

(i)     Granting any and all additional relief that is just and appropriate.

ROBERT A. DAVITCH, ESQ.
WADE D. ALBERT, ESQ.
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
(215) 574-0600
rad@sidkoffpincusgreen.com

Attorneys for Relator,
    Alan E. Cooper, M.D.

Date:  _3/4/13_____