## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN E. COOPER, M.D., | : | CIVIL ACTION |
| For himself and on behalf of the United States | : | |
| of America | : | |
| v. | : | |
| | : | |
| POTTSTOWN HOSPITAL CO., LLC | : | |
| d/b/a POTTSTOWN MEMORIAL | : | |
| MEDICAL CENTER | : | |
| | : | |
| and | : | No. 13-01137 |
| | : | |
| COMMUNITY HEALTH SYSTEMS | : | |
| PROFESSIONAL SERVICES | : | |
| CORPORATION | : | |

### MEMORANDUM

**NORMA L. SHAPIRO, J.**                                    **MARCH 12, 2015**

Relator Alan E. Cooper, M.D. ("Cooper") brings this action, on behalf of himself and the United States of America, against Pottstown Hospital Co., LLC d/b/a/ Pottstown Memorial Medical Center ("Pottstown") and Community Health Systems Professional Services Corporation ("CHSPSC") under 42 U.S.C. § 1320a-7b, the Medicare and Medicaid Patient Protection Act of 1987 (the "Anti-Kickback Statute"), and 31 U.S.C. § 3729 *et seq.*, the False Claims Act.  The United States of America declined to intervene as a party.  Cooper filed an amended *qui tam* complaint on August 7, 2014 (paper no. 36).  CHSPSC and Pottstown moved to dismiss the amended complaint (papers no. 42 and 43) under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  Cooper filed responses in opposition (papers no. 45 and 46).  This court heard oral argument on the motions to dismiss.

The motions to dismiss are granted because Cooper fails to state claims against Pottstown and CHSPSC under the Anti-Kickback Statute and the False Claims Act.

I.    **FACTUAL ALLEGATIONS**

Cooper joined Pottstown in 1999.  Am. Compl. ¶ 23.  He served Pottstown as an orthopedic surgeon and independent contractor from 1999 until July 2011.  Am. Compl. ¶¶ 24, 28.  He alleges that throughout his professional affiliation with Pottstown, he referred many patients to Pottstown for orthopedic surgery and orthopedic-related care.  Am. Compl. ¶ 29.  Due to the nature of his practice, a large percentage of those patients were Medicare-eligible.  Am. Compl. ¶ 30.  Cooper was one of eight orthopedic surgeons on rotation in the Pottstown emergency department ("ER").  Am. Compl. ¶ 31.  CHSPSC "at all relevant times provided management, consulting, legal, advisory and other services" to Pottstown.  Am. Compl. Prelim. Statement.

First On-Call Contract (Effective February - December 2010)

In February 2010, Cooper entered into an on-call coverage contract with Pottstown.  Am. Compl. ¶ 35.  Cooper alleges, on information and belief, that Pottstown entered into similarly structured on-call contracts with other orthopedic surgeons to facilitate the treatment of patients in the ER.  Am. Compl. ¶ 36.  Cooper further alleges, on information and belief, that CHSPSC drafted those on-call contracts and authorized those contractual arrangements.  Am. Compl. ¶¶ 37, 40, 67.

Cooper's on-call contract, in effect for 2010, provided that Cooper would be paid $650 a day for every day he was the doctor on call, irrespective of the number of hours he worked and regardless of whether he was needed in the ER.  Am. Compl. ¶ 41.  It also provided that either he or Pottstown could terminate the contract for any reason by giving the other party sixty days' written notice.  Am. Compl. ¶ 42.  Cooper warranted that no part of his compensation would be in exchange for the referral of patients to Pottstown and that he would be compensated in a manner

that complied with state and federal laws, including the Anti-Kickback Statute ("AKS").  Am. Compl. ¶ 43.

Meetings with Pottstown Management

In October 2010, the Physicians Care Surgical Hospital ("PCSH") opened a facility close to Pottstown.  Am. Compl. ¶ 47.  Cooper had a minority stake in PCSH.  Am. Compl. ¶ 48.  After learning of his financial stake in PCSH, John Kirby and Michael Zwetschkenbaum, respectively the Chief Executive Officer and Chief Financial Officer at Pottstown, had a series of meetings with Cooper during which they "urged and pressured" him to divest his financial stake in PCSH or else risk the termination of his on-call contract.  Am. Compl. ¶¶ 49-51.  Cooper alleges, on information and belief, that CHSPSC authorized Pottstown's efforts to make Cooper divest his ownership interest in PCSH.  Am. Compl. ¶ 53.  Cooper refused to do so.  Am. Compl. ¶ 54.

On October 8, 2010, John Kirby sent Cooper a certified letter informing him that Pottstown would be terminating his on-call contract.  Am. Compl. ¶ 56.  On December 13, after sixty days had elapsed, the contract was terminated.  Am. Compl. ¶ 57.

Cooper alleges, on information and belief, that he was the only orthopedic surgeon at Pottstown whose on-call contract was terminated.  Am. Compl. ¶ 57.  He attributes this outcome to his status as the only orthopedic surgeon at Pottstown with a financial stake in a competitor.  Am. Compl. ¶ 59.

Second On-Call Contract (Effective April - November 2011)

By March 2011, CEO John Kirby had left Pottstown and been replaced by Sharif Omar. Am. Compl. ¶ 65.  In April 2011, after engaging in discussions with Mr. Omar, Cooper entered a new on-call contract with Pottstown.  Am. Compl. ¶ 66.  The new on-call contract mirrored

Cooper's original contract, with one exception: it contained a restrictive covenant that expressly allowed Cooper to retain his affiliation with PCSH, but barred him from contracting for professional services with any other facility within thirty miles of Pottstown without Pottstown's prior written consent.  Am. Compl. ¶ 67.

<u>Termination of Employment Contract and Second On-Call Contract</u>

In April 2011, Cooper was informed that his employment contract with Pottstown would not be renewed because of his financial stake in PCSH.  Am. Compl. ¶ 71.  On April 19, he received written notice that his employment contract would terminate in ninety days; his second on-call contract remained in effect.  Am. Compl. ¶¶ 72-73.

The termination of his employment contract with Pottstown prompted Cooper to secure new employment with St. Joseph's Medical Center in Reading, Pennsylvania.  Am. Compl. ¶ 74. On October 31, 2011, after learning of Cooper's new position at St. Joseph's Medical Center, Mr. Omar notified Cooper that his second on-call contract would terminate in thirty days because of his violation of the contract's restrictive covenant.  Am. Compl. ¶ 75.  The second on-call contract was terminated on November 30, 2011.  Am. Compl. ¶ 76.

In 2012, after consulting with counsel, Cooper determined that this sequence of events—in particular, Pottstown's decision to terminate his on-call contracts based on his affiliation with PCSH— meant that the payments he had received under the on-call contracts were truly intended to induce the referral of Medicare patients to Pottstown in violation of the Anti-Kickback Statute. Am. Compl. ¶¶ 80-82.  Cooper further alleges that Pottstown's decision to penalize selectively other orthopedic surgeons affiliated with PCSH, including Dr. Paris and Dr. Behr, substantiates

this theory.  Am. Compl. ¶¶ 83-88.  Cooper alleges that Pottstown violated the False Claims Act by

falsely certifying compliance with the AKS.  Am. Compl. ¶ 93.

## II.    DISCUSSION

For the reasons that follow, Cooper fails to state claims against Pottstown and CHSPSC

under the Anti-Kickback Statute and the False Claims Act.

Standard

To determine the sufficiency of a complaint, a court must take three steps.  First, it must

identify the elements of each claim at issue.  *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130

(3d Cir. 2010).  Second, it must disregard all conclusory allegations or "naked assertions devoid of

further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Third, the court should

assume the veracity of all well-pleaded factual allegations and then determine whether they

plausibly give rise to an entitlement for relief.  *Iqbal*, 556 U.S. at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and plausibility

of entitlement to relief."  *Id.* at 678 (internal quotations omitted).

Pottstown's Alleged Violation of the Anti-Kickback Statute

In relevant part, the AKS proscribes the act of "knowingly and willfully" offering "any

remuneration (including any kickback, bribe or rebate) . . . to induce" the referral of a Medicare or

Medicaid patient for treatment.  42 U.S.C. § 1320a-7b.  "The [statutory] text refers to 'any

remuneration.' That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended." *U.S. v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985).  The statute therefore covers both (i) a situation in which compensation is exchanged for professional services and (ii) a situation in which no professional service is provided at all (*i.e.* a "kickback" or "bribe").

Because the structure of a proscribed exchange may vary, the statute, at its core, "is aimed at the inducement factor." *Greber*, 760 F.2d at 71.  "The crux of whether the Anti-Kickback Statute [is] violated" is whether the defendant "had the requisite intent to violate the statute," namely, "whether the parties entered business arrangements in exchange for, or to induce, patient referrals." *U.S. ex rel Bartlett v. Ashcroft*, 2014 WL 4179862 at *19 (W.D. Pa. 2014).

Cooper alleges that his on-call contracts with Pottstown were covert means of inducing referrals to the hospital.  He alleges that once Pottstown learned that he had a financial stake in a competitor, it concluded that the purpose of the first on-call contract—ensuring that Cooper would refer patients to Pottstown alone—would be frustrated.  It therefore terminated his first on-call contract.  After entering a second on-call contract with Pottstown, Cooper sought new employment with another hospital, St. Joseph's, prompting Pottstown to terminate that contract too.  Once again, Cooper alleges that Pottstown terminated his second on-call contract because it recognized that he would not be in a position to refer patients exclusively to Pottstown.  He alleges that both his on-call contracts were tainted by an illicit underlying purpose.

This theory is implausible.  First, Cooper does not plead facts sufficient to show that his on-call contracts with Pottstown were not arms-length contracts for his services.  He does not allege that the hospital lacked a business need for on-call coverage by orthopedic surgeons.  Nor does he

allege that he was compensated in excess of fair market value; this might have signaled an intent to reward Cooper for more than just his professional services. Cooper also twice signed statements warranting that no portion of his compensation was in exchange for the referral of patients to Pottstown; he alleges that he operated under that belief until he consulted attorneys in 2012. *See* Am. Compl. ¶¶ 43, 45, 69, 70, 80. Any practicable scheme to induce referrals would not have left him ignorant of its true purpose.

Second, Cooper's conversations with Pottstown management between September and October of 2010 do not plausibly bear on the purpose underlying the first on-call contract. Those conversations took place after Pottstown management learned of his financial interest in a competitor. They responded by trying to make him divest his interest in PCSH. But those developments took place approximately seven months after Pottstown entered an on-call contract with Cooper and cannot be used to establish Pottstown's original contractual intent.

Third, there are more plausible alternative explanations for the termination of Cooper's on-call contracts. Those explanations do not turn on a violation of the AKS. The first on-call contract gave either party the right to terminate the contract without cause. After learning of Cooper's financial interest in a competitor, Pottstown was entitled to exercise that right. The second on-call contract did not require him to divest his interest in PCSH, but contained a restrictive covenant barring Cooper from working for a different hospital within thirty miles of Pottstown without Pottstown's prior written consent. When Cooper secured new employment with St. Joseph's Medical Center, Pottstown terminated his second on-call contract based on breach of the restrictive covenant. *See* Am. Compl. ¶¶ 75-76. The second on-call contract expressly allowed Cooper to

retain his affiliation with PCSH; that is inconsistent with Cooper's theory that Pottstown intended to induce Cooper to refer patients to Pottstown only.

There are contractual arrangements that bear the hallmarks of an AKS violation.  *See*, *e.g.*, *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 93 (3d Cir. 2009) (exclusive service arrangement under which a group of anesthesiologists provided pain management services at a single outpatient clinic and received benefits in return, including free office space, medical equipment, and personnel); *U.S. v. Greber*, 760 F.2d 68, 70 (3d Cir. 1985) (40 percent of every Medicare payment was forwarded to the referring physician, a percentage in excess of the amount permitted by Medicare); *U.S. ex rel. Bergman v. Abbot Laboratories*, 995 F.Supp.2d 357, 362 (E.D.Pa. 2014) (prescription drug manufacturer's use of financial incentives to induce physicians to prescribe a drug for off-label and medically unnecessary purposes).  This is not one of those cases.  Rather, Cooper appears to be manufacturing an AKS claim from an arms-length contractual relationship.  He fails to state a claim against Pottstown under the Anti-Kickback Statute.

<u>Pottstown's Alleged Violation of the False Claims Act</u>

To establish a *prima facie* claim under the False Claims Act ("FCA"), a plaintiff must show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (internal citation omitted); *see also* 31 U.S.C. § 3729(a)(1).  "Falsely certifying compliance with the . . . Anti–Kickback Act[] in connection with a claim submitted to a federally funded insurance program is actionable under the FCA."  *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).  Cooper, proceeding under this false certification theory, alleges that Pottstown falsely

8

certified compliance with the AKS in both its on-call contracts with Cooper and violated the False Claims Act.

Because the alleged FCA violation is premised on a false certification theory, an AKS violation is a predicate to liability under the FCA.  Cooper has failed to plead facts sufficient to show an AKS violation.  Therefore, he fails to state a claim  against Pottstown under the False Claims Act.

CHSPSC

Cooper alleges that CHSPSC authorized and encouraged Pottstown's conduct.  Because the well-pleaded allegations in the complaint are insufficient to state claims against Pottstown under the Anti-Kickback Statute and the False Claims Act, they are also insufficient to state claims against CHSPSC.

An appropriate Order follows.